# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KARI KUYKENDALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | Case No. CIV-19-480-F |
| | ) | |
| LEADER COMMUNICATIONS, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the court is Defendant Leader Communications, Inc.'s Motion for Summary Judgment, filed March 9, 2020. Doc. nos. 34 and 35. Plaintiff, Kari Kuykendall, has responded to the motion, and defendant has replied. Upon due consideration of the parties' submissions, the court makes its determination.

Background

Plaintiff, Kari Kuykendall ("Kuykendall"), originally commenced this action against her former employer, Leader Communications, Inc. ("LCI"), in state court, alleging she was terminated in violation of the Americans with Disabilities Act of 1990 ("ADA"), as amended by the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553, 42 U.S.C. § 12101 *et seq*. LCI removed the action to this court based upon the existence of federal question jurisdiction under 28 U.S.C. § 1331. Having conducted discovery regarding Kuykendall's claims, LCI now moves for summary judgment, under Rule 56(a), Fed. R. Civ. P., on Kuykendall's alleged ADAAA claims. Kuykendall opposes summary judgment with respect to her disparate treatment and failure to accommodate claims. As to the retaliation claim, Kuykendall represents that she does not assert a retaliation claim.

Doc. nos. 39 and 41, ECF p. 9, n. 1.  Because the state court petition and the parties' joint status report indicate the existence of a retaliation claim, the court deems the state court petition amended under Rule 15, Fed. R. Civ. P., to exclude that claim. Consequently, only the ADAAA disparate treatment and failure to accommodate claims are subject to review under Rule 56(a).

Standard of Review

Rule 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense—or part of each claim or defense—on which summary judgment is sought."  Rule 56(a), Fed. R. Civ. P.  Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id*.  In deciding whether summary judgment is appropriate, the court does not weigh the evidence and determine the truth of the matter asserted, but only determines whether there is a genuine issue of material fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Id*. at 248.  A fact is "material" if under the substantive law it is essential to the proper disposition of the claim.  *Id*. In adjudicating a motion for summary judgment, the court views the evidence and draws all reasonable inferences therefrom in the light most favorable to Kuykendall, the non-moving party.  McGehee v. Forest Oil Corporation, 908 F.3d 619, 624 (10th Cir. 2018).

Relevant Facts

The following relevant facts are undisputed or viewed in a light most favorable to Kuykendall.  LCI is a government contractor that provides telecommunications equipment and support to the United States military.  The company is ISO 9001:2015 Certified, ISO 20000-1:2011 Certified and ISO 27001:2013 Certified.  These certifications enable LCI to bid and win certain

government contracts.  To maintain the certifications, LCI is audited by outside auditors.   Documenting,  reviewing,  updating,  and  following  processes  and procedures are mandatory parts of maintaining ISO-certification.

Mike Lyles ("Lyles") is the owner and chief executive officer of LCI.  He is a service-disabled veteran.

In January of 2018, LCI hired Kuykendall as its Human Resources ("HR") Manager.  Kuykendall reported to LCI's President, Angela Cole ("Cole").  The duties and responsibilities of the HR Manager included "[m]anaging company HR policies  and  procedures"  and  "[d]emonstrating  flexible  and  efficient  time management and ability to prioritize workload."  Doc. no. 34-5.

At the time of Kuykendall's employment, the HR Department consisted of the HR Manager, HR Generalist and HR Recruiter.  Within a month of Kuykendall's hiring, the HR Generalist resigned.  Doc. no. 39-1, pp. 150-51.

Like other employees, the first 90 days of Kuykendall's employment were considered an introductory period.  During that period, LCI could "terminate [her] employment immediately, with or without cause and with or without notice."  Doc. no. 34-4.  Kuykendall's employment officially began on January 2, 2018.

The day she began her employment, Kuykendall was asked to complete an EEO Report Information - Employee form, for purposes of complying with government record keeping, reporting and other legal requirements.  In completing the form, Kuykendall left blank the "Disabled" box.  Doc. no. 34-6.  Prior to March 26, 2018, Kuykendall did not advise anyone at LCI that she had migraines. She did not advise anyone that she suffered from depression, anxiety or post-traumatic stress disorder.

On January 12, 2018, Kristina Todd ("Todd"), Director of Quality and Risk Management, advised Kuykendall that the employee handbook was due for annual review on February 10, 2018 and the annual eSign session for the document would

expire on February 28, 2018.   Todd asked for any changes or updates to the document by February 10, 2018, so it could be processed for review and could be re-deployed for the annual eSign.   Subsequently, Kuykendall asked Todd about extending the eSign session expiration date.   In an email dated January 26, 2018, Todd indicated that she could extend the eSign expiration date out if needed. Kuykendall replied by email that same date, asking for an extension, "[s]ince this is my first go-around."  Doc. no. 39-20.  The employee handbook with all approved corrections was submitted on March 20, 2018.  Kuykendall testified that Cole was aware of the extension and did not object to it.  Doc. no. 41-1, p. 102.

On March 2, 2018, Kuykendall met with Cole for their regular Friday status meeting.  Later that day, Kuykendall sent an email to Cole requesting an additional status meeting "to have a candid discussion before [she] reach[ed] the end of [her] 90-day probationary period."  Doc. no. 34-7.  In the email, Kuykendall stated:

> In our meeting today you said I was doing good, but needed to prioritize better.  I admit, I personally feel that things are not going well.  I have expressed to you previously that I am overwhelmed and I mentioned today that it was difficult to keep up with everything that needed to be done since [the HR Recruiter] was prohibited from assisting with anything not related to recruiting.  I do understand the priority to recruit for bids and to generally recruit to backfill positions and find highly qualified candidates.  I also appreciate the suggestion to bring in a temp, but I am undecided at this point whether it would be inefficient to have to train a temp and then turn around and train a new employee once we are able to find the right candidate to fill the open HR Generalist position.

*Id*.

On March 5, 2018, Kuykendall and Cole had the additional status meeting. Cole sent an email to Kuykendall the next day recapping major matters discussed in the meeting.  The first major point was "tools" that Cole had provided, namely, "HR

processes/policies, HR task calendar, Annual HR Activities schedule, and mapping of HR processes to basic activities." Doc. no. 34-8. Cole talked with Kuykendall about "the HR Sharepoint site web parts" where they tracked what was in progress and what was completed. *Id*. Another major point discussed was "due dates for recurring tasks and other tasks assigned, and the importance of meeting dates or discussing status ahead of time so we can determine what we need to do to adjust to meet dates—or provide new due dates when possible." *Id*. Cole advised that, "[w]e must meet assigned dates." *Id*. The final major point discussed was HR Manager responsibilities and that the HR Manager's "position is responsible for managing the HR department and ensuring that the HR activities are completed as required." *Id*.

On February 22, 2018, Kuykendall was assigned an employee investigation that was to be completed on Friday, March 23, 2018. In the mid-afternoon of March 23rd, Kuykendall sent an email to Cole attaching her investigation report. Kuykendall stated in the email she had been unable to coordinate a good time to speak with one of the witnesses – the accused employee under investigation – until the previous afternoon but went ahead and sent the report since Cole needed the report that day. She recommended that she have a witness present when any conversations with that person occurred. Kuykendall testified that she notified Cole as soon as she became aware that she would not be able to complete the report. She also testified that she had believed that her subordinate, Sean Rosales ("Rosales"), the HR Recruiter, would be available the week of March 19th to be a witness for her interview of the accused employee, but Rosales was out of the office the entire week for personal reasons.

Kuykendall also had another assignment, "to write training for the MSP," that had been assigned to her and she had not provided Cole any update on that project by March 23, 2018. Cole testified that the assignment was due on March 23, 2018.

Doc. no. 39-1, pp. 66-67.  According to Kuykendall, no "due dates" had been set and she had been working on it.  Doc. no. 39-9.

Cole testified in deposition that she decided over the weekend, March 24, 2018 and March 25, 2018, to terminate Kuykendall.  Cole testified she had no documentation to show the decision to terminate was made that weekend.  Cole testified that she told Lyles of her decision.  Doc. no. 39-1, pp. 62, 64.

On March 26, 2018, Kuykendall sent an early morning text message to Cole stating that she was "battling a strong migraine" and hoped to be in later that morning.  Doc. no. 34-10; doc. no. 39-18.  Kuykendall texted Cole later, stating that her migraine was getting worse and she was not sure she would be able to make in it before the end of the day.  She also stated that she would let Rosales know.  *Id.* Cole responded that she would let Rosales know and she was sorry Kuykendall was ill.

On Tuesday, March 27, 2018, Kuykendall sent an early morning text message to Cole stating that she was "still having issues with the migraine."  Doc. no. 34-10; doc. no. 39-18.  She also texted "[w]e are going to have to have a discussion about accommodations when I am back about these issues."  *Id*.  She advised that her doctor had prescribed her a "new RX Friday to control the panic attacks I've started having again after having them controlled for a long time" and stated that the doctor said the medicine "could cause headaches but denied it would cause [her] migraines again."  *Id*.  She texted that she stopped the "new RX" and would call the doctor for further guidance.  Cole thanked Kuykendall for her text.

The following day, March 28, 2018, Kuykendall sent another early morning text message to Cole stating that she was going to urgent care when they opened to get some relief from the ongoing migraine.  Cole thanked Kuykendall for her text.

On Thursday, March 29, 2018, Kuykendall sent an early morning text message stating that she was still feeling terrible.  She advised she had

documentation from urgent care but needed to call her doctor for further guidance. She stated that she would be sending Lyles an email that day "about the situation and to request to start the interactive process for reasonable accommodations should I still have a job when I return." Doc. no. 34-10; doc. no. 39-18. Later that day, she texted she was able to get into her regular doctor and planned to be in the office the next day. Cole thanked Kuykendall for her text.

Kuykendall testified that she was not able to email Lyles because Cole had cut off access to her work email. Doc. no. 39-1, pp. 151-152.

On that same day, Cole and Rosales found in Kuykendall's desk Human Resources Action Forms for six employees regarding pay raises. The forms had not been logged into the computer system as received or placed in the proper folder. The forms had been given to Kuykendall on March 20, 2018. Under LCI's work instructions, the forms were to be logged into the computer system within one business day. Kuykendall testified the forms did not get processed because she was out unexpectedly with the migraine. The forms were processed by Rosales and the employees timely received their pay raises.

In Kuykendall's office, Cole and Rosales also found a large stack of personnel files and loose paperwork which Kuykendall had marked completed and filed in the system, but which had not been properly filed. Kuykendall testified that the files were not in the file cabinet because they had been requested by auditors. Doc. no. 41-1, pp. 281-282.

On Friday, March 30, 2018, Kuykendall sent Cole an early morning text message advising that she was still having residual symptoms that would make it difficult to be productive. She also informed Cole that, "I am going to prefer to have someone present on my behalf during any conversations that take place when I return so I have spoken with counsel to see when they can be available to be present and ensure my rights remain intact." Doc. no. 34-10; doc. no. 39-18. Cole responded

later that, "[w]e don't allow 3rd parties in personnel meetings.  We will be glad to meet with you to discuss your introductory period review and discuss any issues then."  *Id*.

During the week of March 26, 2018, Cole did not make any arrangements to complete the employee investigation that had been due on March 23, 2018.  The investigation was never completed as the accused employee shortly thereafter left LCI.

On April 2, 2018, the 90th day of Kuykendall's employment, Cole sent an early morning text message to Kuykendall stating that "[w]e would like to conduct your introductory period review with you and discuss any issues on Tuesday (tomorrow)" and asked Kuykendall whether 8:00 a.m. or 8:30 a.m. would be better for her.  Doc. no. 34-10; doc. no. 39-18.  Kuykendall stated that she had planned to come in to work that day and asked if there was any reason why she was not supposed to come in to work.  Cole responded that per Kuykendall's text on Friday, they had set up the meeting with her for Tuesday.  Kuykendall replied that she didn't understand; she didn't say she was not coming in on Monday and asked if she was receiving administrative paid leave.  Cole then sent a text message asking Kuykendall to report that afternoon at 3:00 p.m. for the meeting.

Cole met with Kuykendall as scheduled.  Todd was also present.  Kuykendall recorded the meeting without advising Cole or Todd.  Cole started the meeting stating she was giving Kuykendall an introductory period review.  She advised that they were still having issues with Kuykendall "meeting due dates and forms and processes."  Doc. no. 34-16, p. 4.  Kuykendall inquired as to "[w]hich due dates." *Id*.  Cole mentioned the employee investigation that was due on March 23, 2018. Kuykendall informed Cole it was difficult to contact two of the witnesses and that she could not contact the accused employee until she had talked to the two witnesses. She also said that she never talks to an accused person without a witness.  Cole asked

Kuykendall if she remembered the March 5th meeting and discussing that if Kuykendall was going to miss some dates, she needed to let Cole know.  Cole said the employee investigation fell under that category.  Kuykendall told Cole that she wanted to clarify that the March 5th meeting had not been requested to discuss performance issues.  Rather, she wanted to discuss health-related issues, but she felt she would have received a bad response if she told Cole she was not at the meeting to discuss performance issues.  Doc. no. 34-16, pp. 6-7 (Kuykendall deposition).

Next, Cole mentioned the "MSP" assignment.  Kuykendall told Cole that she had been working on it and stated "[w]e had not set due dates" because she was trying to get documents prepared to present to the management review team.  Doc. no. 34-16, p. 7.

Cole thereafter stated to Kuykendall that "these things are not about you being off last week.  These things are about following process and meeting requirements." *Id*. at p. 11.  When questioned by Kuykendall as to what process, Cole gave as an example, Kuykendall not logging in the pay raises that she had given her on March 20th and putting them into the right boxes.  Kuykendall responded that it would have been done if she had not been out the prior week.  Cole then stated that "[t]his is about meeting job requirements and about meeting due dates.  And so based upon that, we're – we're going to do a term letter." *Id*. at p. 13.  Cole then asked Kuykendall if she had any paperwork for her or LCI.  Kuykendall responded that she had "LCI data." *Id*.

Kuykendall then stated:

> The one thing that's a shame, though, is if you would have went through the interactive process with me for a reasonable accommodation, I probably could have met the requirements.  But since you did not have that conversation with me, then I feel like [the termination] is a little premature[.]

*Id.*

Later, Kuykendall stated;

> So it's just unfortunate because I think if we had really talked about the reasonable accommodations, even today, and even if you said, "We're just extending your probation," things would have been different with reasonable accommodations, but I don't have the opportunity to – –

*Id.* at p. 19.

Cole responded:

> We have no – we had no idea.  And when we sat down on the 5th, I – I was – I was listening.  So had anything been shared with me – we have done accommodations for folks historically here on a lot of different fronts.  So that is a conversation we have had before and – and – and anticipate having again with other folks . . . as I said, we had – we had opportunities, I just didn't – I – I can only go on what you told me. Okay?

*Id.*

Kuykendall stated in reply:

> Well, I did tell you early last week, and so you've really had several days to consider having the – the interactive process conversation.

*Id.*

Thereafter, Cole stated:

> From my standpoint, when Friday came we were still missing dates and some other things that happened on the 23rd.  We were still having problems after we had met a couple of weeks before,  So that – those are – those were the things I was going on . . . .

*Id.* at p. 20.

Kuykendall was provided a separation of employment letter advising that her employment had ended effective April 2, 2018.  The letter had been prepared ahead of the meeting.  The letter stated in part, "[d]uring your introductory period, you have continued to miss due dates on assignments and have not coordinated alternate due dates and have not requested any additional training or assistance to complete your assigned tasks.  You have not met job performance requirements."  Doc. no. 34-17.

Kuykendall applied for unemployment benefits with the Oklahoma Employment Security Commission (OESC).  In a letter dated April 25, 2018, Cole, on behalf of LCI, protested those benefits.  Cole stated that Kuykendall was terminated "due to her continued decisions to miss assigned due dates and for choosing not to follow documented work processes, which are required to meet the performance requirements for this position."  Doc. no. 34-18.  She stated that Kuykendall "also did not show up for work for an entire week (March 26-30, 2018) and provided no documentation for her absences."  *Id.*

In the letter, Cole gave as some examples of missed due dates, the employee handbook, the employee investigation and the MSP assignment.  Cole also mentioned the documentation that had been found in Kuykendall's office which had not been logged as received or not properly filed.

Cole then discussed the April 2nd meeting and in so doing stated:

> [Kuykendall] made a statement to the effect if we knew her accommodations then we would extend her introductory period—but she did not discuss any condition, any accommodations needed, and provided no documentation, for either her weeklong absence or for any accommodations to be evaluated.  We never received any documentation from Ms. Kuykendall to show that she had been out due to medical reasons, had seen any physicians, had any types of requirements, etc. . . . Further, without submission of any documentation, her leave for the

> previous week was not approved . . . Kuykendall did not
> report to work for the entire last week of her introductory
> period, and her continued poor performance during the
> period was the reason she was terminated.

*Id.*

During her deposition, Kuykendall testified that on one occasion, Cole had discussed with Kuykendall that she was concerned about some data entry errors that Rosales had made and when Kuykendall told Cole that Rosales had a medical condition that she believed could potentially be considered a disability under the Americans with Disabilities Act, Cole dismissed it and responded to her statement inappropriately.  Doc. no. 41-1, pp. 206-207.

Rosales testified that on Thursday of the week of March 26, 2018, Lyles informed him that Kuykendall was to be terminated and he would be taking over HR functions.  After Kuykendall was terminated, Rosales took over the HR functions but did not take the HR Manager's title.  His position was HR supervisor and senior recruiter.   Cole also took on some of the HR duties.

Discussion

A. *Proof of Discrimination Via Direct Evidence*

In her papers, Kuykendall argues that her ADAAA disparate treatment claim is supported by direct evidence of discrimination.  Specifically, Kuykendall relies upon Cole's letter to OESC protesting Kuykendall's receipt of unemployment benefits.  Kuykendall asserts that Cole, on behalf of LCI, specifically admitted three times in the letter that Kuykendall was terminated for her absences during the week of March 26, 2018.   Kuykendall asserts that these absences resulted from her disability.  Kuykendall also points out that LCI, as part of its answer to a discovery interrogatory requesting the reason for her termination, referred to the OESC letter.

"A plaintiff may prove discrimination through either direct or circumstantial evidence."  <u>Jones v. U.P.S., Inc.</u>, 502 F.3d 1176, 1188 n. 6 (10th Cir. 2007).  When a

plaintiff proffers direct evidence of discrimination, the burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), does not apply. <u>Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985)</u>.  "Direct evidence demonstrates on its face that the employment decision was reached for discriminatory reasons."  <u>Danville v. Reg'l Lab Corp.</u>, 292 F.3d 1246, 1249 (10th Cir. 2002).  Specifically, "[d]irect evidence is evidence from which the trier of fact may conclude, without inference, that the employment action was undertaken because of the employee's protected status."  <u>Sanders v. Southwestern Bell Telephone, L.P.</u>, 544 F.3d 1101, 1105 (10th Cir. 2008).  Direct evidence may include proof "of an existing policy which itself constitutes discrimination," or "oral or written statements on the part of a defendant showing a discriminatory motivation[.]"  <u>Hall v. U.S. Dept. of Labor, Admin Review Bd.</u>, 476 F.3d 847, 854-855 (10th Cir. 2007) (quotations omitted).  A defendant's statement "that can plausibly be interpreted two different ways—one discriminatory and the other benign—does not directly reflect illegal animus, and thus, does not constitute direct evidence."  <u>Id</u>. at 855 (quotation omitted).

Upon review of the OESC letter, the court concludes that it does not constitute direct evidence of discrimination.  The letter states in pertinent part:

> [LCI] is protesting benefits for [Kuykendall], who was employed by LCI from January 2, 2018 to April 2, 2018, as a Human Resources (HR) Manager.  She was terminated due to her continued decisions to miss assigned due dates and for choosing not to follow documented work processes, which are required to meet the performance requirements for this position (see Exhibit A, Term Letter).  *[Kuykendall] also did not show up for work for an entire week (March 26 – 30, 2018) and provided no documentation for her absences.*

Doc. no. 34-18, p. 1 (emphasis added).

The letter additionally states in pertinent part:

> [Kuykendall] made a statement [during the April 2nd meeting] to the effect of if we knew her accommodations then we would extend her introductory period—but she did not discuss any condition, any accommodations needed, and provided no documentation, for either her weeklong absence or for any accommodations to be evaluated.  We never received any documentation from [Kuykendall] to show that she had been out due to medical reasons, had seen any physicians, had any types of requirements, etc. . . . Further, without submission of any documentation, her leave for the previous week was not approved (see Exhibit E, HRP-115).   We have also included Exhibit F which shows our Introductory Period policy HRP-127.  *[Kuykendall] did not report to work for the entire last week of her introductory period, and her continued poor work performance during the period was the reason she was terminated.*

*Id*. at p. 4 (emphasis added).

Lastly, the letter states in pertinent part:

> In summary, we respectfully protest benefits for [Kuykendall] due to . . . [h]er intentional decisions to not complete assignments by due dates, her indifference to following documented processes which created significant rework and errors in the HR department and delayed the completion of other related actions, and her logging of status showing actions had been completed that had not actually been completed . . . [and] *[h]er status as having not completed the introductory period since she didn't report to work during the final week of her introductory period.*

*Id*. (emphasis added).

In the court's view, the emphasized statements of the letter do not meet the exacting standard of direct evidence of a disability-discriminatory motive.  The statements fail to demonstrate that Kuykendall's absences the week of March 26, 2018 were a basis for her termination.  The written statements are not evidence that

a rational juror could conclude, without inference, that Kuykendall was terminated due to her absences, which Kuykendall claims was the result of her alleged disability.

Because the court finds that the OESC letter does not constitute direct evidence of discrimination, the court shall evaluate Kuykendall's ADAAA disparate treatment claim using the McDonnell Douglas framework.

B. *Disparate Treatment Claim*

The McDonnell Douglas framework requires Kuykendall to establish a prima facie case of discrimination under the ADAAA by showing: (1) that she is disabled within the meaning of the ADA; (2) that she is qualified, with or without reasonable accommodation, to perform the essential functions of the job held; and (3) that she was discriminated against because of her disability. Lincoln v. BNSF Railway Company, 900 F.3d 1166, 1192 (10th Cir 2018); Dewitt v. Southwestern Bell Telephone Company, 845 F.3d 1299, 1308 (10th Cir. 2017); and Kilcrease v. Domenico Transportation Co., 828 F.3d 1214, 1218-1219 (10th Cir. 2016). With respect to the third element, Kuykendall must show that she suffered an adverse employment action because of her disability. Dewitt, 845 F.3d at 1308. At the summary judgment stage, it is incumbent upon Kuykendall to raise a genuine issue of material fact on each element of the prima facie case. Davidson v. Am. Online, Inc., 337 F.3d 1179, 1189 (10th Cir. 2003).

If Kuykendall establishes a prima facie case, the burden shifts to LCI to articulate a legitimate nondiscriminatory reason for its employment decision. Lincoln, 900 F.3d at 1193; Dewitt, 845 F.3d at 1308. If LCI articulates such a reason, the burden shifts back to Kuykendall to show that LCI's proffered reason is a pretext for discrimination. *Id*.

Kuykendall may show pretext by "revealing weakness, implausibilities, inconsistencies, incoherences, or contradictions" in [LCI's] proffered reason, "such

that a reasonable fact finder could deem [LCI's] reason unworthy of credence." Lincoln, 900 F.3d at 1193; *see also*, Dewitt, 845 F.3d at 1311.

In its motion, LCI only challenges the third element of the prima facie case. However, for purposes of summary judgment review, the court assumes, without deciding, that Kuykendall has demonstrated a genuine issue of material fact as to the third element of the prima facie case. Thus, the burden shifts to LCI to articulate a legitimate reason for the termination of her employment. LCI has proffered evidence that Kuykendall was terminated because she "continued to miss deadlines, failed to follow process and was generally not meeting LCI's requirements during the introductory period." Doc. no. 34-3, ¶ 15. With this explanation, LCI has carried its burden and Kuykendall must establish a genuine dispute as to whether LCI's proffered reasons were pretextual.

Viewing the evidence in a light most favorable to Kuykendall, the court finds that she has presented sufficient evidence to raise a genuine issue as to whether proffered reasons were pretextual. Initially, LCI asserts that Kuykendall "continued to miss deadlines" by failing to complete the employee investigation and the MSP assignment on March 23, 2018. As to a prior missed deadline, LCI contends that Kuykendall missed the deadline in February for updating the employee handbook. However, Kuykendall has proffered evidence that the February deadline was extended by Todd and that Cole was aware of that extended deadline and did not object to it. Moreover, Kuykendall has presented evidence that there were no due dates set for the MSP assignment. Thus, the evidence viewed in a light most favorable to Kuykendall only shows one missed deadline—the employee investigation report—rather than continued missed deadlines.

In addition, as to failure to follow process, LCI relies upon Kuykendall's failure to log employee pay raises and failure to file employee personnel files and other forms. This conduct was discovered by Cole and Rosales on March 29, 2018.

However, Cole testified in deposition that she made the decision to terminate Kuykendall on the weekend of March 24, 2018 and March 25, 2018. Therefore, a rational juror could conclude that incidents of failure to follow process did not go into Cole's decision to terminate.

Moreover, the evidence and reasonable inferences therefrom, viewed in Kuykendall's favor, raises an issue of fact as to whether the decision to terminate was made during the week of March 26th after Kuykendall sent text messages, rather than during the weekend of March 24, 2018 and March 25, 2018. Cole testified that after she decided to terminate Kuykendall, she advised Lyles of the decision. Lyles, however, told Rosales on Thursday, March 29, 2018, that Kuykendall was to be terminated and that Rosales would be taking over HR functions. Kuykendall had also sent a text message to Cole early Thursday morning, stating that she was going to email Lyles to request to start the interactive process for accommodations and Kuykendall was unable to email Lyles to make her request because her access to work email was cut off by Cole.

Kuykendall has also presented the OESC letter in which Cole, on behalf of LCI, protested her receipt of unemployment benefits because she was absent the entire week of March 26, 2018 and did not provide documentation for her absence. Although the court has found that the letter is not direct evidence of discrimination, a rational juror could infer that LCI also relied upon her absences, resulting from the migraine, as a basis for Kuykendall's termination. Additionally, the court notes that LCI maintains that Kuykendall's leave was not approved because she did not submit any documentation to support her absences. LCI argues, in reply, that adherence to its absenteeism policy (to consider the days missed by Kuykendall as unexcused) is not evidence of discrimination. With its papers, LCI has presented a policy regarding attendance. Doc. no. 34-11. That policy states that "[a]ny absence due to illness of three (3) or more consecutive days *may* require a doctor's release to return

to work." *Id*.  The recording of the April 2nd meeting does reveal that Cole asked Kuykendall for "paperwork," but a rational juror could conclude that Kuykendall did not understand what Cole was requesting with her reference to "paperwork" because Kuykendall answered that she had "LCI data." Doc. no. 34-16, p. 13.  Cole did not follow up with a request for a doctor's note or the documentation that Kuykendall had stated in her text message that she possessed.  A rational juror could conclude that a doctor's note or other documentation was not being required by Cole.

LCI additionally asserts that Kuykendall failed to meet LCI's requirements by not complying with its attendance policy with respect to reporting her absences.  The attendance policy requires that if an employee is unable to work because of illness, the employee must "call" the supervisor in advance of the scheduled shift.  Doc. no. 34-11.  LCI contends that Kuykendall sent text messages rather than calling Cole.  Kuykendall, however, has proffered evidence that she notified Cole by text message when she had been sick in February and that Cole approved that leave.  Doc. no. 39-1, pp. 169-170.

Further, Kuykendall has presented evidence that she was not informed of her termination until after she had been absent from work with her migraine and had mentioned the need for accommodation.  *See*, DePaula v. Easter Seals El Mirador, 859 F.3d 957, 976 (10th Cir. 2017) (temporal proximity can support a finding of pretext in combination with other evidence of pretext).

As previously stated, the court, in adjudicating LCI's motion does not weigh the evidence and determine the truth of the matter, but only determines whether a genuine issue of material fact exists for trial.  Anderson, 477 U.S. at 249.  The court concludes that Kuykendall has raised a genuine issue of material fact as to the pretext component of the McDonnell Douglas framework.  Therefore, the court concludes that summary judgment is not appropriate on the disparate treatment claim.  The court will note, however, that it denies summary judgment on the disparate treatment

claim only by giving Kuykendall the full benefit of the application of the stringent Rule 56 standard. There is much about this claim that is not flattering to Ms. Kuykendall. Although the court has concluded that this claim clears the Rule 56 bar, a jury may make short work of it.

C. *Failure to Accommodate Claim*

Failure to accommodate claims under the ADAAA are not analyzed under the McDonnell Douglas framework as previously described. Rather, they are evaluated under a modified burden-shifting framework. *See*, Punt v. Kelly Servs., 862 F.3d 1040, 1049-1050 (10th Cir. 2017). Under this modified framework, Kuykendall must make an initial showing that (1) she is disabled; (2) she is otherwise qualified; and (3) she requested a plausibly reasonable accommodation. *Id*. at 1050. If Kuykendall makes a facial showing her prima facie case, the burden shifts to LCI to present evidence either (1) conclusively rebutting one or more elements of the prima facie case or (2) establishing an affirmative defense, such as undue hardship or one of the other affirmative defenses available to LCI. *Id*. If LCI satisfies its burden, summary judgment is appropriate for LCI unless Kuykendall presents evidence establishing a genuine dispute regarding the affirmative defenses or rehabilitates any challenged elements of the prima facie case sufficiently to establish a genuine dispute of material fact as to such challenged elements. *Id*.

In its motion, LCI challenges Kuykendall's ability to demonstrate the third element of her prima facie case—that she requested a plausibly reasonable accommodation. LCI contends that Kuykendall's text messages were not requests for an accommodation. LCI points out that Kuykendall stated in her text messages that she wanted "to have a discussion about accommodations when I am back" and would "be sending [Lyles] an email [] explaining the situation and to request to start the interactive process for reasonable accommodations." Doc. no. 34-10. According to LCI, these statements were not a request for any specific accommodation. To the

extent the messages could be construed as asking forgiveness for her missed deadlines, performance problems or her unexcused absences, LCI contends that these requests do not amount to reasonable accommodation requests.

Kuykendall argues, in response, contends that in the text messages she sent to Cole, she requested the reasonable accommodation of time off work due to her migraine.  According to Kuykendall, Cole acknowledged each of her texts but did not engage in the interactive process with respect to the requested accommodation. Kuykendall also posits that while two of the text messages mentioned accommodations, each text message she sent to Cole was a request for accommodation for time off due to her migraine.  Kuykendall maintains that LCI failed to accommodate any of her absences as it told the OESC that the absences were unapproved and cited those absences as a basis for her termination.

Upon review, the court finds that summary judgment is appropriate on the failure to accommodate claim.  "[B]efore an employer's duty to provide reasonable accommodations—or even to participate in the 'interactive process'—is triggered under the ADA, the employee must make an adequate request, thereby putting the employer on notice."  *See*, E.E.O.C. v. C.R. England, Inc., 644 F.3d 1028, 1049 (10th Cir. 2011) (citing Smith v. Midland Brake, Inc. 180 F.3d 1154, 1171 (10th Cir. 1999)).  Awareness of a disability is not sufficient to place the employer on notice that an employee needs an accommodation.  Dinse v. Carlisle Foodservice Products, Inc., 541 Fed. Appx. 885, 890 (10th Cir. 2013) (unpublished decision cited as persuasive pursuant to 10th Cir. R. 32.1(A)).  "[T]he employee must make an adequate request for an accommodation for the disability."  *Id*. (citing C.R. England, Inc., 644 F.3d at 1049-1050)).  "The request for accommodation must be sufficiently direct and specific, giving notice that [the employee] needs a special accommodation."  C.R. England, Inc., 644 F.3d at 1049 (quoting Calero-Cerezo v. U.S. Dept. of Justice, 355 F.3d 6, 23 (1st Cir. 2004)).

Even viewed in Kuykendall's favor, the text messages do not provide notice to Cole that Kuykendall is seeking "approved" time off for each day of absence from work due to her migraine.  The text messages make Cole aware that Kuykendall has a migraine, but it do not place Cole on notice that Kuykendall needs an approved leave of absence accommodation for her migraine at that time.  At the April 2nd meeting, Kuykendall suggested to Cole that she should receive an extension of her introductory period.  However, again, the text messages do not make any such request to Cole.  Consequently, the court concludes that Kuykendall has failed to raise a genuine issue of material fact as to whether she requested a plausible reasonable accommodation from LCI.  The court therefore finds that LCI is entitled to summary judgment on the failure to accommodate claim.

D. *After-Acquired Evidence*

In its motion, LCI seeks a ruling that Kuykendall's damages are limited solely to the time period between the date of her termination, April 2, 2018, and the date of her discovery responses, September 9, 2019.  LCI contends that it learned for the first time in Kuykendall's deposition on February 13, 2020 that she was dishonest on her employment application and in her job interview as to the reasons for leaving two of her previous jobs.  According to LCI, it would have immediately terminated Kuykendall's employment, if it had found out about her dishonesty.  LCI states that it had requested information about the reason for termination of employment with respect to those two prior employment positions when it sent its first set of discovery requests, but Kuykendall failed to provide that information in her discovery responses.

Kuykendall, in response, objects to the court's consideration of the defense because LCI's answer does not include the defense.  She argues that to the extent the court construes LCI's summary judgment motion as a motion to amend LCI's answer, the motion should be denied because the motion is past the deadline for

21

amending pleadings and discovery is needed to adequately address the alleged defense.

Citing Fields v. Integris Health, Inc., No. CIV-17-730-D, 2019 WL 1433768, at *6 (W.D. Okla. Mar. 29, 2019), LCI urges the court to allow it to constructively amend its answer via its summary judgment motion to include the after-acquired evidence defense.

Upon review, the court declines to address the after-acquired evidence issue raised by LCI. The court recognizes that the Tenth Circuit has not yet decided whether after-acquired evidence in fact constitutes an affirmative defense. However, as stated by the Honorable Timothy DeGiusti in Fields, the Eleventh Circuit has held that it is an affirmative defense. See, Holland v. Gee, 677 F.3d 1047, 1065 (11th Cir. 2012). And in Holland, the Eleventh Circuit ruled that the district court erred in applying the doctrine when it was not pleaded in an answer or included in the pretrial order. Judge DeGiusti, however, also recognized that "the Tenth Circuit has declined to adhere strictly to the pleading requirement of Rule 8(c)[, Fed. R. Civ. P], 'when the purpose of the requirement has been otherwise fulfilled.'" Fields, 2019 WL 1433768, at *6 (quoting Ahmad v. Furlong, 435 F.3d 1196, 1201 (10th Cir. 2006)). He stated that "[r]ather than demanding the defendant first move to amend the answer [to plead the affirmative defense], [courts] need only apply the same standards that govern motions to amend when [they] determine whether the defendant should be permitted to 'constructively' amend the answer by means of the summary-judgment motion." Id. (quoting Ahmad, 435 F.3d at 1202).

Although Judge DeGiusti allowed the Fields defendant to constructively amend his answer with its motion, despite the parties' briefs not squarely addressing the issue, the court, in the case at bar, declines to so. The standards of Rule 15(a), Fed. R. Civ. P., governing motions to amend have not been addressed. Moreover, since LCI is seeking leave to amend to allege the defense after the scheduling order

deadline, it not only must satisfy the standards of Rule 15(a), but it must also, under Tenth Circuit authority, satisfy the standards of Rule 16(b)(4), Fed. R. Civ. P. <u>Tesone v. Empire Marketing Strategies</u>, 942 F.3d 979, 989 (10th Cir. 2019) ("A party seeking leave to amend after a scheduling order deadline must satisfy both the Rule 16(b) and Rule 15(a) standards"). The Rule 16(b)(4) standards have not been addressed. The court declines to decide whether LCI may amend its answer to raise the after-acquired evidence defense without the proper standards being addressed. Therefore, the court finds that LCI's motion as to after-acquired evidence defense should be denied. The court hastens to add that this determination does not necessarily deprive LCI the benefit of the after-acquired evidence defense (with its potentially dramatic effect on recoverable damages) at trial. After all, plaintiff is now well aware that the after-acquired evidence defense is in the mix. For purposes of satisfying the stringent Rule 16(b)(4) good cause standard, Kuykendall may well be in as good a position now as she would have been if a motion for relief from the scheduling order deadline had been filed at an earlier stage.

Conclusion

Based upon the foregoing, Defendant Leader Communications, Inc.'s Motion for Summary Judgment, filed March 9, 2020 (doc. no. 34), is **GRANTED in part** and **DENIED in part**. This case shall proceed to trial on plaintiff, Kari Kuykendall's disparate treatment claim under the ADAAA. Any issues as to the availability of the after-acquired evidence defense will be addressed at such time as they are properly laid before the court.

IT IS SO ORDERED this 12th day of May, 2020.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

19-0480p008.docx